HOWARD N. BAILEY, RESPONDENT, *v.* SARAH A. BAILEY, APPELLANT.

*Adultery — one marrying in good faith, after having recovered a judgment for divorce and before its reversal on appeal, is not guilty of adultery.*

Upon the trial of this action, brought by the plaintiff to obtain a divorce from his wife on account of her adultery, evidence was given on behalf of the defendant tending to prove that the plaintiff himself had been guilty of the same offense, by proving that upon a former trial of this action a judgment was on February 5, 1886, entered in favor of the plaintiff, containing the usual permission for him to marry again; that upon an appeal taken on March 5, 1886, to the General Term, this judgment was, on September 20, 1886, reversed; that on March 5, 1886, the plaintiff, in good faith, married another woman, with whom he cohabited until September seventeenth, when hearing that the General Term had decided to reverse the judgment, he ceased to cohabit with her. *Held,* that the defendant was estopped by the former judgment, from asserting that the plaintiff committed adultery with the woman he married in reliance thereon.

APPEAL from a judgment in favor of the plaintiff entered in Kings county upon the trial of this action by the court without a jury.

This action was commenced to obtain a divorce on the ground of the defendant's adultery. The parties were married on the 12th day of December, 1867. The action was first tried on the 4th of February, 1886, and judgment rendered for plaintiff and entered on February 5, 1886. From that judgment the defendant, on March fifth, appealed to the General Term of the Second Department, which reversed it. After the entry of the judgment on the first trial the plaintiff married another woman, and thereafter cohabited with her until the 17th day of September, 1886, when he was notified that the judgment was reversed, whereupon he immediately ceased all marital relations with her. The order reversing the judgment was entered the 20th day of September, 1886.

*A. H. & W. E. Osborn,* for the appellant.

*Herbert S. Ogden,* for the respondent.

PRATT, J :

The question of defendant's guilt of adultery with Moore, before she became insane, was too plainly proven to admit of serious controversy. Mrs. Ryan testified that she saw them in bed together in the daytime during plaintiff's absence from his home. Other witnesses testified to other facts which clearly indicated the same relations The learned trial judge believed this testimony. We see no reason to criticise his findings. The other questions of plaintiff's guilt are more serious; but we incline to the belief that the defendant was *estopped* by the former judgment from asserting that plaintiff committed adultery with the woman he married *in reliance thereon.* And, hence, that the learned trial judge was correct in directing the entry of judgment of divorce.

It appears that this action was tried before another judge upon charges of adultery with another man, resulting in a judgment in plaintiff's favor, entered February 5, 1886, containing the usual permission that plaintiff might marry again. He availed himself of this privilege, and, in good faith, married another lady with whom he cohabited until September 17, 1886. He then heard that the General Term had decided to reverse the judgment and he, therefore, ceased such cohabitation. The General Term order and judgment were not entered until September 20, 1886. Hence, this

cohabitation was wholly within the period while the judgment was in force and under the form of a marriage. The charge of adultery against plaintiff is based upon no other suggestion of sexual intercourse. Even this has not been plead as a defense. Perhaps the fact that defendant's insanity at the commencement of this action renders it necessary that the court should take cognizance of the fact of this cohabitation, irrespective of her pleading, is just, as in cases of a general answer by an infant. But, in the view which we have adopted, it will become unnecessary to deal with this suggestion. We place our decision on a ground which, if sound, will be more useful to all parties concerned.

It is now argued in behalf of the defendant that the reversal of the first judgment left the parties in precisely the same legal situation, and all their acts subject to precisely the same legal consequences as if it had never been entered at all. The first part of the proposition may be conceded, but we are unable to assent to the latter part of it. The court certainly had full and complete jurisdiction over the parties and the subject-matter of the action, and there is not the slightest suggestion of any wrong by the plaintiff in obtaining the judgment. The case of *McGiffert* v. *McGiffert* (31 Barb., 69) and *Vischer* v. *Vischer* (12 id., 640), and others which we may incidentally note hereafter, are, therefore, distinguishable from this one on this plain ground. There was, therefore, a just and lawful judgment, which, in form at least, annulled this marriage and bound the parties so long as it remained unreversed. It was, apparently, the voice of the law permitting the plaintiff to marry again. Remarriages by plaintiffs who have been lawfully divorced are encouraged quite as much as original marriages between unmarried persons. This judgment was, therefore, apparently an invitation to plaintiff to seek a new marriage relation. Although erroneous, it went into full force and effect on February 5, 1886, and thus remained during the whole period of plaintiff's cohabitation under the second marriage. In other words, while this cohabitation was going on, this judgment was a complete estoppel upon every person interested in the matter from alleging that it was adulterous. No lip could be open to challenge either its morality or legality. And the question then recurs, did the reversal of this judgment in any respect affect

the legal or moral character of this *cohabitation?* In other words, can *the law*, in one breath, invite an act, and, in the next, condemn it as illegal and immoral, simply because one of its ministers has made a mistake. It should be observed that the precise point under consideration is the moral and legal character of this *cohabitation*, and that the force and effect of the reversal upon the *legal status* of these parties as husband and wife has no place in the discussion. Of course they were man and wife, and had never ceased to be, for the reason that the law ignores the erroneous judgment upon existing rights so soon as it is blotted out. But not so of the *cohabitation* under the erroneous judgment. That did her no wrong in a legal sense, for the reason that it was an act lawfully done under existing authority of law.

In the first place the element of voluntary immorality is utterly wanting, just as in cases of complete rape * * * or where the act is accomplished by fraud * * * or while one of the parties is insane. (2 Waite's Act. and Def. 559, citing the cases.) The essence of the act is its voluntary immorality. It is not immoral, for the reason that it is done in good faith and in obedience to the invitation extended by the law itself. To hold otherwise would be to permit the law itself to perpetrate a fraud upon the party who thus cohabited in reliance upon its representation. Such cohabitation, where the parties are fully justified in believing in the innocence and legality of the act, is quite as clearly an honest mistake of fact, as where a woman submits to the embrace of a man honestly believing him to be her husband. (*Supra.*) In the next place all the analogies of the law relating to *private rights*, and the cases seem to us to sustain the view which we have expressed. If this judgment had been for a sum of money, the plaintiff might lawfully have taken defendant's property in satisfaction, unless the proceedings were stayed pending the appeal, and the act of taking and holding would not have constituted a wrong in any legal sense of the term. (*Langley* v. *Warner*, 3 Comst., 327 ; *Simpson* v. *Hornbeck*, 3 Lans., 53.)

True, there would have been the duty of restitution on reversal; but that duty would not have arisen *until* reversal, and its foundation would then have rested "*in conscientia.*" It would have arisen *ex æquo et bono*. The same would have been true of an equity

judgment requiring the performance of some particular act. Performance of the act would not have constituted duress. Much stronger is the case of judgments requiring abstinence from particular acts. For them the law permits no indemnity either as restitution, *eo nomine,* or as damages, unless some undertaking has been given. And, again, suppose the judgment had been used in evidence on the trial of some other action, as an estoppel; a judgment entered thereon would not have been effected by the reversal of the first judgment. The relief against such an injustice must be accomplished, if at all, by some subsequent act of the court and does not result, *ipso facto,* by reason of the first judgment. And, again, drawing a closer analogy, take the case of *Valleau* v. *Valleau* (6 Paige, 207), where a man abandoned his wife, and they were separated for more than five years, without her knowledge of the fact that he was alive, and the wife, still ignorant of his existence, and in good faith, married and cohabited with her second husband. The intercourse was not adulterous. Indeed, since such a marriage was valid until the entry of the decree annulling it, we fail to see why the wife would not have been guilty of adultery, respecting her second husband, if she had returned to cohabitation with the first one. In such cases the issue of the second marriage is absolutely legitimate (*Bowers* v. *Brower*, 9 N. Y., Leg. Obs., 196; *Price* v. *Price*, per Landon, J., Warren Circuit, April, 1874), and marital rights result to the husband in the wife's property as in *Griffin* v. *Banks* (37 N. Y., 621; S. C., 24 How. Pr., 215); and dower is acquired by the wife in the husband's lands as in *Price* v. *Price* (33 Hun, 76). See, also, *White* v. *Lowe* (1 Red., 376); *Wyles* v. *Gibbs* (1 Red., 382). And, again, in *Colvin* v. *Colvin* (2 Paige, 385), it was said that a wife divorced for adultery could not lawfully remarry her former husband until the decree divorcing them was annulled, and that children born of such cohabitation would have been illegitimate. Of course it may be said that some of them are cases where the second marriage was lawful and simply voidable. But that is not to the point. The point is that wherever the law invites an act, which would otherwise be unlawful, whether it be by express general provisions or through a *valid judgment* which purports to express the law of the particular case, the acts of parties in pursuance thereof are not *illegal,* and especially is

connubial cohabitation, under such circumstances, free from the charge of adultery.

The same results are apparent if the subject is examined from the standpoint of *public* rights, for it would scarcely be contended that this plaintiff could be convicted of bigamy upon his second marriage solemnized while this first judgment was in force. We have not overlooked the cases which apparently seem to bear a close analogy, in which such intercourse is spoken of in general terms as adulterous. (*Comstock* v. *Adams*, 12 Chicago Legal News, 359; S. C., 23 Kansas, 514; 2 Bish. on M. and D., 753, 753*a;* *Crouch* v. *Crouch*, 30 Wis., 667; *Warner* v. *Warner*, 11 Kansas, 121; *Allen* v. *McClelland*, 12 Pa. St., 328.) But they, like the *McGiffert* and *Vischer* cases (*supra*), have more apparent than real bearing, because the judgments were either *void* for want of *jurisdiction* or the results of frauds perpetrated upon the court by the parties who sought protection under them. This case proceeds on the theory of *good faith;* and it is not met by the suggestion that plaintiff's second marriage was within the time for an appeal. This first judgment took effect *on its entry*, and was then operative to protect this plaintiff from a charge of adulterous intercourse. To hold otherwise would be to say that a judgment for divorce, unlike any other, did not take effect until thirty days after its entry, and not then or for an indefinite period thereafter, if appeals were taken in due time. Of course, the plaintiff and his second wife ran the risk of the reversal of the first judgment, and that risk involved the validity of their marriage and perhaps the legitimacy of the children begotten of it, if any; but it seems an absurdity to say that this defendant, who during the whole period of this cohabitation *was estopped* from asserting that it was otherwise than innocent and lawful, could, after the reversal, be heard to say that it was adulterous and unlawful. The acts which plaintiff performed were not wrongs *against this defendant* at the time when they were done. They were done in reliance upon, and in a certain sense, under legal sanction. Their legal character did not change with the reversal of the judgment. There is nothing, *ex equo et bono*, bearing any analogy to restitution, which could be effected by the reversal. Everything of that nature is accomplished by her restoration to the married state, in which the reversal placed her. One might with

equal propriety insist that a new judgment in another action obtained upon the first judgment as evidence of a right or incident of a right of recovery, was *pro facto* annulled by the reversal of the first judgment. This illustration will alone suffice to show that the general proposition that the reversal operates to obliterate the judgment for all purposes, is too broad and is not of universal application. It operates upon the *status quo* at the time it is entered, but does not give any *new rights* except those to which the idea of restitution may be legitimately applied. Even that right relates only to the *status quo*.

If one must wait for the expiration of the time for an appeal in such a case, why must he not also wait until the possibility of a new trial for newly discovered evidence shall have passed by the death of contemporary witnesses ?

The fact that a reversal might defeat a second marriage, and possibly bastardize children, is not to the point. That result happens in consequence of the fact that two marriage states for a single person cannot lawfully exist at the same time, and the latter must yield to the former from the necessity of the case. But that is not true of the *character* of cohabitation in reliance on such a judgment as this, because the physical act constituting the intercourse may happen even during a state of unqualified marriage without being adulterous, in the eye of the law.

BARNARD, P. J., concurred ; DYKMAN, J., not sitting.

Judgment affirmed, with costs.